IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

NANCY VELASQUEZ,

        Plaintiff,

vs.                                                              No.  07cv0010 DJS

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## MEMORANDUM OPINION

This matter is before the Court on Plaintiff's (Velasquez's) Motion to Reverse and Remand for Payment of Benefits or in the Alternative, to Remand for a Rehearing **[Doc. No. 18]**, filed June 15, 2007, and fully briefed on August 10, 2007.  Velasquez seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).  Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds that the motion to reverse is not well taken and will be **DENIED**.

## I.  Factual and Procedural Background

Velasquez, now fifty-eight years old (D.O.B. June 18, 1949), filed her application for disability insurance benefits on March 11, 2002 (Tr. 50), alleging disability since December 15, 1999 (Tr. 53), when she was fifty years old, due to shoulder and back problems and pain (Tr. 50, 62).  Velasquez's insured status for disability insurance benefits expired on December 31, 2002.  Thus, Velasquez must establish that she was disabled on or before that date.  *See Henrie v. United States Dep't of Health & Human Servs*., 13 F.3d 359, 360 (10th Cir.1993).  Velasquez has a twelfth grade education and past relevant work experience as a laundry worker (Tr. 63).  On March

24, 2004, Velasquez attended the first administrative hearing.  Tr. 270-308.  On July 16, 2004, the

ALJ denied benefits, finding Velasquez was not disabled.  Tr. 20.  Velasquez filed a Request for

Review of the decision by the Appeals Council.  The Appeals Council denied Velasquez's request

for review of the ALJ's decision.  Tr. 5.  Velasquez then filed a Complaint in federal court (CIV

No. 04-1242 WPL).  On May 4, 2005, Defendant filed an Agreed Motion to Reverse and Remand

for Further Administrative Proceedings [Doc. No. 14].  On June 1, 2005, the magistrate judge

granted the motion.

Upon remand, on March 14, 2006, a second ALJ held an administrative hearing.  On

August 17, 2006, the ALJ issued her decision denying benefits.  On September 13, 2006,

Velasquez appealed the ALJ's August 17, 2006 decision.  On November 17, 2006, the Appeals

Council declined to assume jurisdiction of the case.  Tr. 302-304.  Hence, the August 17, 2006

decision of the ALJ became the final decision of the Commissioner for judicial review purposes.

Velasquez seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. §

405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final

decision is supported by substantial evidence and whether he applied correct legal standards.

*Hamilton v. Secretary of Health and Human Servs.,* 961 F.2d 1495, 1497-98 (10th Cir. 1992).

Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion. *Glass v. Shalala,* 43 F.3d 1392, 1395

(10th Cir. 1994).  "Evidence is not substantial if it is overwhelmed by other evidence in the record

or constitutes mere conclusion."  *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992).

Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989). "[I]n addition to discussing the evidence supporting her decision, the ALJ must discuss the uncontroverted evidence she chooses not to rely upon, as well as significantly probative evidence she rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996). Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met. *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III. Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity. *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)). The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f). The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled. *Thompson*, 987 F.2d at 1487./

At the first four levels of the sequential evaluation process, the claimant must show she is not engaged in substantial gainful employment, she has an impairment or combination of

impairments severe enough to limit her ability to do basic work activities, and her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past.  20 C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience. *Id.*

In support of her motion to reverse, Velasquez makes the following arguments: (1) substantial evidence does not support the ALJ's RFC finding; (2) the ALJ failed to follow controlling law regarding the jobs the VE identified and failed to explain why she rejected her counsel's hypothetical question which included her vision and syncopal episode impairments; and (3) the ALJ's pain and credibility analysis is not linked to specific evidence.

**A.  Medical Record**

**1.  1994**

On December 30, 1994, Allen R. Gelinas, M.D., an orthopedic surgeon, evaluated Velasquez.  Tr. 109-112.  Dr. Gelinas evaluated her for a **January 23, 1991** work-related injury. Tr. 109-112. On that day, Dr. Gelinas noted Velasquez had "not seen any physician since she was discharged by Dr. Heckl sometime in **1992**.  Tr. 110.  Dr. Gelinas noted in part:

> **MECHANISM OF INJURY**:  Apparently there was no specific mechanism of injury.  She was working a job which required a fair amount of over the shoulder type of work.  She gradually developed some right shoulder pain and was diagnosed as having an impingement syndrome.
>
> Initial treatment was done by Dr. Kennedy at Occupational Medicine.  He referred the patient to Dr. Pachelli who treated her conservatively initially with injections and therapy, and then did a decompression of the shoulder on 4-23-91.  An arthroscopic subacromial decompression (procedure for the treatment of subacromial impingement syndrome) was done.

Following this, she was sent back to therapy.  She continued to have some problems and was seen by Dr. Heckl.  Then after failed conservative treatment, Dr. Heckl brought her back to the operating room where the shoulder was re-arthroscoped.  Residual impingement of the right shoulder with AC joint arthritis and a Grade 1, SLAP (Superior Labrum Anterior to Posterior) lesion was found.[1]  She had resection of the distal clavicle plus a redecompression.

She was again treated conservatively following the surgery and eventually reached MMI as of June 29, 1992.  a 25% impairment was given to her and she was advised to work with limitation of overhead type of work.

**PHYSICAL EXAMINATION:**  The patient is five feet and weighs 155 pounds.  Her blood pressure [is] 112/70.  Pulse is 68.  Ms. Velasquez is a pleasant lady.  She has no pain on palpation of the right shoulder except over the AC joint.  A bony prominence was palpated in this area.  There is some mild discomfort on palpation of the lower scapular spine muscles.

Healed arthroscopy portals are noted.

Palpation of the upper trapezius and cervical spine muscles produce no complaints of pain. There was no muscle spasms.

Ms. Velasquez has a full range of motion of her neck.

A full range of motion of the right shoulder is noted without any crepitation or grinding with this activity.  There is no signs of any impingement.

Reflexes in the upper extremity are normal.  No muscle atrophy is noted.  There is normal strength.  No sensory deficits are noted.

There was also slight complaints of pain on palpation of the medial epicondyle area, more so on the right, although range of motion is within normal limits.

**IMPRESSIONS:**
  1.  Post-operative arthroscopic decompression and resection of distal clavicle on the right
  2.  Medial  epicondylitis not related to her injury of 1-23-91.

---

[1] In a SLAP lesion the labrum is torn at the superior of the glenoid.  The long head of the biceps tendon attaches in the glenoid as part of the labrum.  The most common way to develop a SLAP lesion is repetitive overhead arm motions with tension on the biceps. http://www.wheelessonline.com/ortho/superior_glenoid_labrum_lesions_slap.

**DISCUSSION:**  Ms. Velasquez presents with <u>very minimal complaints and also minimal objective findings regarding her right shoulder</u>.  I do feel that her AC joint tenderness which radiates into the lower scapular region is related to her previous injury of 1-23-91.

The elbow complaints are not related to her old injury.

**<u>At this time, the patient has much less than the 25% impairment which she was originally given.  She is capable of returning to LIGHT-MEDIUM duty level.  She should avoid overhead work</u>**.

Tr. 110-111 (emphasis added).

**2.  1995**

On March 30, 1995, Velasquez returned to see Dr. Gelinas.  Tr. 108.  Velasquez reported the medication Dr. Gelinas prescribed was helping her.  Velasquez was working as a secretary for her husband's used car dealership.  Velasquez complained that she still had some burning pain in her right shoulder and scapular area which was aggravated "by sitting at a desk bending over writing."  *Id.*  Dr. Gelinas prescribed Salsalate (a nonsteroidal anti-inflammatory drug) and directed her to return on an as needed basis.

**3.  1996**

On May 13, 1996, Velasquez returned to see Dr. Gelinas.  Tr. 107.  Velasquez complained she was "still having some pain in her shoulder" which "continue[d] to be aggravated with lifting."  *Id.*  Dr. Gelinas noted Velasquez had come in to see him because she had run out of her medication and "came in , basically, to have this renewed."  *Id.*  Dr. Gelinas renewed her prescription for Salsalate and directed her to return on an as needed basis.

On March 31, 1998, Velasquez went to University Hospital emergency room for shortness of breath.  Tr. 114-117.  Velasquez reported she had no history of asthma and complained of dyspnea, wheezing and coughing.  Tr. 116.  Velasquez also informed the physician she has been

6

treating herself with other family member's medication.  The physician prescribed Albuterol,

Beclovent, and Robutussin AC.  Tr. 114.

**4.  2001**

On February 16, 2001, Robert Schenck, M.D., Attending Physician, Department of

Orthopaedics at University Hospital, evaluated Velasquez at the request of Dr. Gelinas.  Tr. 147-

148.  Velasquez complained of shoulder and back pain.  **At this time, Velasquez listed Premarin**

**as the only medication she was taking**.  Dr. Schenck noted in part:

> **PHYSICAL EXAM:**  Physical examination reveals forward flexion to 170 bilaterally.
> Internal rotation to T12 on the affected right shoulder.  Left is to T10.  She has 5/5 strength.
> She definitely has AC joint tenderness.  Positive cross arm adduction.  Positive O'Brien's test.
> Low back pain is in the lumbar sacral junction.  She has a negative straight leg raise
> bilaterally.  Deep tendon reflexes are 2+ at the knee and ankle.  She has normal strength.  She
> walks heel and toe normally in the office today.
>
> **X-RAYS:**  Radiographs of the right shoulder on true AP, axillary, lateral and outlet view
> reveal **mild** glenohumeral degenerative changes.  She has AC joint changes and a type II
> acromion.  Radiographs of the lumbar spine were unavailable.
>
> **IMPRESSION:**
> 1.  Right shoulder with recurrent symptoms of SLAP lesion, AC joint arthritis and type
>     II acromion.  She certainly may require repeat arthroscopy, open distal clavicle
>     excision and an acromioplasty.  The patient is fairly symptomatic and we will begin
>     physical therapy as well as Celebrex 200 mg/p.o./qd.  We discussed the risks of
>     surgery.  I explained to her that we could make her worse, but in all likelihood, she
>     would be improved.  Nonetheless, I was very specific that we could not guarantee her
>     that she would be improved with surgery.  Nonetheless, the patient was desirous of
>     proceeding.  I'd like to get an MRI of her shoulder just to evaluate her rotator cuff.
>     Will obtain a plan one and not an arthrogram as I think that if she comes to surgery,
>     arthroscopy would be the most useful option.
>
> 2.  Low back pain without significant radicular symptoms.  I do feel Physical Therapy
>     would be useful in this patient, and  I vote for a stretching program as well as
>     strengthening of her abdominals.  We will see how this does with the patient, and I
>     will see her back in approximately 2 months with all results of these studies.

Tr. 147-148 (emphasis added).

On March 14, 2001, Velasquez went to University Hospital, Family Practice Clinic for an annual examination.  Tr. 145-146.  Michael Murnik, M.D., examined Velasquez.  Dr. Murnik noted Velasquez had not been seen since 1998 due to financial reasons.  Velasquez complained of worsening of her asthma but noted she did not need to go to the emergency room or be hospitalized.  Tr. 145.  Velasquez reported she relieved her symptom of tightness in her chest with Albuterol and Azmacort but due to financial problems she had been unable to purchase these medications.  Velasquez reported she had been getting these medications by borrowing them from family and friends.  Thus, she used Albuterol and Azmacort very sparingly when she could get them.

Velasquez also complained of upper back muscle pain.  Velasquez reported "[e]xperiencing daily muscle pain and spasms in her upper/mid back in the rhomboideus region for about six months."  Tr. 145.  Velasquez denied a specific injury but reported she was working at a laundry doing a fair amount of lifting, folding and upper body work when she developed the problem.  Dr. Murnik prescribed Albuterol for her asthma.  Dr. Murnik also prescribed a nonsteroidal anti-inflammatory drug, warm packs, and stretching exercises for her back.  Dr. Murnik placed Velasquez on HRT due to hot flashes and mood instability.  Dr. Murnik ordered a mammogram and directed Velasquez to return for cholesterol and glucose screening after she met with the financial office.

**5.  2002**

On **January 7, 2002**,[2] Velasquez went to University Hospital emergency room with complaints of "charley horse both legs, mostly right since x-mas– currently has numbness right lower leg– states 'feels cold' – also c/o excessive thirst, frequent urination & vaginal itching."  Tr. 149.  Her CBG (capillary blood glucose) was 358.  Velasquez also reported a change in her vision with decreasing acuity.  *Id.*  The physician diagnosed Velasquez with diabetes and prescribed Glucophage.  Tr. 140, 144.  The physician also referred Velasquez to Michael Murnik, M.D., and directed her to "go to diabetes education class on 1/11/02 @ 10 AM."  *Id.*

On January 10, 2002, Velasquez kept her appointment with Dr. Murnik.  Tr. 138-139.  Dr. Murnik noted Velasquez was "**last seen about a year ago for asthma refills and annual examination" but "did not return for her screening labs**."  Tr. 138.  Dr. Murnik also noted Velasquez was "[r]eferred from Emergency Room for follow-up on newly diagnosed diabetes mellitus type II."  *Id.*  Dr. Murnik notes indicate the following:

> The patient was given a prescription for Glucophage at that time and has a follow-up appointment.  **The patient has no complaints at present**.  <u>She has not taken the Glucophage yet</u>.  She is unable to pay for a glucometer, but her mother is a diabetic and had several and lend her one which she can use for a while.  <u>Finger stick glucose this morning done by her mother was 133</u>.  <u>The patient has not applied for assistance as [she]has not filed income tax for several years so it would be difficult for her to get through the qualification process</u>.
>
> **   **   **   **   **
>
> IMPRESSION AND PLAN: The patient is a 52 year old woman with two chronic diseases now; newly diagnosed type II diabetes mellitus, resistant to interventions, education, etc. Also with an inability to pay and the difficulty of not having filed taxes interfering with the ability

_____

[2] Although the record indicates this visit took place on "1/7/01" it appears the visit took place on January 7, 2002.  See Tr. 144 (emergency discharge information reflects a date of "1/7/02" with a referral to Dr. Murnik on "1/10/02 at 10:15 AM"); see also Tr. 142 (indicates a date of "1-7-02" for the same visit); Tr. 140.

to get the support.  I know that she would qualify particularly for the diagnosis of diabetes mellitus.

1.   Relative to the asthma the patient was encouraged to take her Azmacort steadily as prescribed and not PRN.  Use the Albuterol as a rescue vs maintenance medications.

2.   Relative to the diabetes mellitus– Encourage the patient to test her glucose at least bid before each meal.  Follow-up in 2-3 weeks with a record of CBGs so can tailor education and treatment to results, but will not overwhelm the patient with untenable plans at present.  Recommend activity, avoidance of processed foods and sweets. Finger stick glucose and next time will try to encourage patient education and diabetic education and work on medications.

Tr. 138 (emphasis added).

On February 21, 2002, Velasquez returned for her follow up with Dr. Murnik.  Tr. 136.

Velasquez reported her asthma was under better control, her vision was better, but that she still

had not picked up all her medications because she could not apply for financial assistance due to

not filing income taxes for the last three years.  Velasquez also complained of right shoulder and

back pain.  Dr. Murnik noted in part:

OBJECTIVE:  Weight 173, blood pressure 121/65, pulse of 65, temperature 97.4, well developed, well nourished woman, alert, awake, and appropriate, in no acute distress.  CBG of **120 fasting this morning at 6:30**.  January CBG adding around 250 since February 1, 2002 range has been 80-150 with the **vast majority** in the **80-120 range**.  The patient has gotten some **reading glasses** which are +1.5 diopters.

ASSESSMENT AND PLAN:
1.   Type II diabetes mellitus– I continued care as best I can, is doing well with diet and exercise.  **Medications she apparently sharing with her mother-in-law.**  Needs ophthalmology until straightens out money situation.  Strongly recommend that deals with taxes, get into a payment agreement so they can at least file for assistance which I image (sic) she would qualify for.
2.   Asthma– Quiescent at present.
3.   Osteoarthritis– Recommend exercise, weight loss, Extra Strength Tylenol.
4.   Financial– The patient needs to settle [her] tax issue so can take care of self.

Tr. 136 (emphasis added).

On June 18, 2002, x-rays of the chest indicated a **normal chest** with "no evidence of

pneumonia or other pathologic findings."  Tr. 135.  On the same day, x-rays of the right shoulder

indicated "no evidence or fracture, dislocation or other significant radiographic abnormality."  Tr. 134.

On July 23, 2002, Velasquez went to University Hospital emergency room with complaints of  "shoulder, neck pain to right shoulder, c/o numbness to right arm."  Tr. 125.  At this visit, **Velasquez listed estrogen, Albuterol and Azmacort as her "Current Meds**."  The physician noted, "Right neck pain– shoots to right arm with some numbness of wrist area; symptoms for 2 weeks, ibuprofen ineffective, denies chest pain.  *Id.*  The examination revealed "tender [at] C-spine & right paraspinous muscles, range of motion of neck full, clear lungs, . . . full range of motion of right shoulder in abduction/adduction rotation."  Tr. 126.  The physician ordered x-rays of the cervical spine and an EKG; **both were normal**.  Tr. 123, 124.  The physician's final diagnosis was "**muscle strain right neck and shoulder**."  *Id.*  The physician prescribed Norflex (a muscle relaxant), wet heat, and directed Velasquez to follow up with her own physician.  *Id.*

On September 30, 2002, Velasquez returned to the Family Clinic at University Hospital for a follow up after being treated for a urinary tract infection.  Tr. 163.  Carla Lich, a nurse practitioner, evaluated Velasquez.  Ms. Lich noted:

> S:    Here for f/u after UTI.  Denies burning with urination at this time.  Taking Metformin (oral antihyperglycemic drug) 500 mg 1 tab q AM & PM.  <u>AM fasting BS 118-194.  PM BS at HS 176-250.</u>  Just began using Advair 2 days ago.  Had some difficulty learning to administer Advair.  **Has not had any "sleep or syncopal" episodes for several months.**  Has not received appt. for sliip (sic) clinic.  <u>Continues smoking 3 cigarettes/day.</u>  Has appt. 10/23 for pap.
> O:    Well nourished adult female in no acute distress.  Peak flows 170, 330 and 150– Pt coughing.
>       Lungs: CTA (clear to auscultation) bilat[erally]
>       Heart:  S1, S2, no murmur
> A:    DM2, Asthma, <u>Sleep vs. syncopal episodes</u>
> P:    **CBG at 6:30- 178**, UA– WNL; Discussed importance of glycemic control and how this is maintained through nutrition, medications and exercise– Verbalizes understanding.  Refer to Health Ed. nutrition counseling.  Discussed importance of

> f/u with sleep clinic– Will call pt with appt.  Discussed pt should not be driving.
> Discussed imp. of smoking cessation.  Rtc to PCP f/u DM and Asthma.

*Id.* (emphasis added).  Ms. Lich referred Velasquez to the sleep clinic to rule out a sleep disorder

(Tr. 161) and to the ENT clinic to evaluate her hearing in the left ear (Tr. 157) .  Ms. Lich also

referred Velasquez to a social worker to evaluate her home situation and her financial problems.

Tr. 159.  Velasquez had reported she was separated from her husband and was unable to work

because she had four young children.  *Id.*

On October 30, 2002, Velasquez returned to see Dr. Murnik.  Tr. 154.  Dr. Murnik noted

Velasquez had been to urgent care for "poor diabetes control."  *Id.*  Velasquez reported she "had

been in relatively good control until a month or so ago when [she] noted blood sugars high in the

200's."  At that time, she was "found to have an asymptomatic urinary tract infection."  After

treatment, Velasquez reported her "sugars got better but then got worse again."  Velasquez

admitted to "decreased activity with change in the weather."  Velasquez also reported her husband

had lost his job and thus she was still having financial problems.  Velasquez's CBG that morning

was 202.  Dr. Murnik assessed Velasquez as follows:

> 53 year old woman with <u>relatively poorly controlled diabetes mellitus at the present.  Most
> likely due to nutrition and exercise</u>.  Follow up with nutrition today.  Recommend decreased
> dietary calories for increased calories burned to improve diabetes mellitus control without
> evidence of occult infection historically or by laboratories today.  Refill all medications.
> Follow up after financial assistance visit.  Would also schedule sleep study and bone
> densitometry study after financial assistance visit as the patient will be unable to afford these
> studies unless she has some help.

Tr. 154 (emphasis added).

On November 19, 2002, an agency consultant completed a Physical Residual Functional

Capacity Assessment.  166-173.  The agency consultant opined Velasquez retained the RFC to

perform light work.  Tr. 167.  To support his RFC recommendation, the agency consultant noted:

Claimant is a 53 yo female with allegations of shoulder and back problems.  S/P (status post) R arthroscopic subacromial decompression 4/91 and re op in 1992.  Saw Dr. Schenck Orth 2/01 for R. shoulder pain.  Forward flexion was 170 degrees, int[ernal] rotation to T12, 5/5 strength, AC joint tenderness.  X-ray read by radiologist as no significant abnormality but by Dr. Schenck as type II acromion and mild deg[enerative] changes at glenohumeral joint.  He recommended MRI for possible repeat operation but claimant was unable to do this for financial reasons.  Dr. Schenck also evaluated c/o LBP (lower back pain) with occasional radiation to R Buttock.  On PE (physical examination) pain at LS junction, negative SLR (straight leg raises), normal reflexes, strength and gait.  Rec[ommended] PT (physical therapy) which she did not do secondary to money issues.

Obesity, NIH (National Institute of Health) level I with BMI (Body Mass Index) of  34.2 (Obesity).  New DM diagnosed 1/02 with RBS (random blood sugar) of 343, last fasting finger stick was 120 in Feb. 2002.  She is on Metformin.

Asthma, longstanding on albuteral (sic) and azmacort when she can afford them.  No ER visits or hospitalizations.

On DAR c/o pain that causes her alternate between stand, sit, and lying down.  The normal low back exam cannot account for impairment nor can the shoulder problem alone.  Lifting is restricted because of the shoulder problems.  She should be able to walk/stand and sit for 6 hours in a work day with normal breaks.

Tr. 167-168.

**6.  2003**

On January 31, 2003, Velasquez returned to University Hospital Orthopaedics Clinic with

complaints of right shoulder pain.  Tr. 225-226.  Robert Schenck M.D., Professor, Department of

Orthopaedics, and Ted Schwarting, M.D., House Office, Department of Orthopaedics, evaluated

Velasquez.  Dr. Schwarting noted:

**HISTORY:**
The patient is a 53-year-old female who presents today for a first time evaluation in our clinic.  The patient states that she is here today to obtain a letter stating that her right shoulder pain is related to her original accident at work.  This accident was now more than 10 years ago.  **The patient desires to have this note so that she can receive disability payments**.  She spoke with somebody with regards to this process, she is not sure whether it is a lawyer or not**.**

**The patient states that her right shoulder pain does not have limitation of strength or motion**.  **She does have pain with extended periods when working with her hands in front of her**.  She has pain, which she states limits her ability to work.  She is not able to work 8 hours and changed to 6 hours of work, but then was unable to work for this period of time.

13

She feels that working less than 6 hours is not worth her time.  She is also complaining of neck and low back pain.  She denies any weakness or numbness in the extremities.  She has no other complaints today.

**PHYSICAL EXAM:**
The patient is a mildly obese female in no acute distress.  She is alert and oriented.  She is appropriate.  Evaluation of the patient's right shoulder reveals her to have forward elevation to 180 degrees, which is equal to the left.  She has 50 degrees of external rotation on the right as compared to 50 degrees of external rotation on the left.  She has internal rotation to T8, which is equal to the left.  The patient has 5 out of 5 strength to supraspinatus and subscapularis testing.  The patient has 5 out of 5 strength of the biceps.  The patient has light touch sensation intact throughout the right upper extremity.  She does have some mild pain with cross arm adduction.  There is tenderness to palpation over the acromioclavicular joint.

**X-RAYS:**
<u>**Radiographs obtained today reveal no evidence of significant osteoarthritis**</u>.  There is evidence of a previous distal clavicle excision, which appears adequate.

**IMPRESSION:**
Right persistent shoulder pain after surgical procedures by Dr. Kennedy and Dr. Pacelli greater than ten years ago.

**PLAN:**
The patient was seen and discussed with Dr. Scheneck today.  It is essentially impossible for us to state whether patient's pain is related to her original injury.  Certainly, there is some suggestion that her pain may be some way related to the surgeries for the distal clavicle, but these are normal postoperative pains, which we have all encountered in our practices.  **We have suggested to the patient that she will most definitely have some residual pain, which she will have to learn to live with; she understands this.  <u>She is not requesting any pain medication today</u>**.  She understands that in order to receive a letter regarding that the pain is related to the original injury, she may have to return to the original surgeons who performed the surgeries in 1991 and 1992.

Tr. 225-226 (emphasis added).

On February 26, 2003, Velasquez returned to see Dr. Murnik.  Dr. Murnik noted:

**SUBJECTIVE:**
Nancy Velasquez is a 53-year-old woman with a history of asthma, type 2 diabetes mellitus, and back and shoulder pain.  **She is recently back on the UNM Care Plan and presents complaining of feeling "bad."**  <u>She reports loss of appetite, nausea, nocturnal leg cramps, blurred vision, forgetfulness, tiredness, and loss of 11 pounds in the last three months. Positive polydipsia and polyuria.  Currently her only medications for diabetes are metformin 1 PO b.i.d. 500 mg.  Blood sugars have been quite high– this morning 327, despite what</u>

14

patient reports as loss of appetite and not eating much.  She denies any infection symptoms. She has no fevers, chills, shakes, sore throat, cough, shortness of breath, chest pain, abdominal pain, diarrhea, dysuria, frequency, or back pain other than her chronic back and shoulder pain.  She has no costovertebral angle tenderness.  No vaginal discharge or skin breaks.

**OBJECTIVE:**
VITAL SIGNS:  Blood pressure 126/65,; weight 159 lb., which is down 11 lbs. from last visit; respirations 20; pulse 63; temperature 96.5 degrees F.
GENERAL:  This is a moderately overweight woman who is awake and appropriate and in no acute distress.  CBG 327.

**IMPRESSION/PLAN:**
Type 2 diabetes: Out of control and symptomatic.  Will add Glucotrol XL, 5 a day. Advised about the potential for hypoglycemia now with these medications.  Advised continued exercise and activity and attention to diet.  Patient states that she knows what to eat, but she does not have any of it and is not interested in meeting with the nutritionist at present.

She is concerned about her blurry vision and wants a referral to Eye Clinic, which we will do– but advised her we need to get the sugar under control before seeing them, because any prescribing done while she has blurriness from high sugars will make the prescription not useful once we get her sugars under control.  She is due for an eye appointment anyway, so we will schedule.

Also schedule bone mineral density as previously planned, now that she is on the plan– it will pay for it.

Follow up in one week to assess efficacy– may need to increase Glucotrol and hope to encourage visit with nutritionist or diabetic counselor.  Follow up sooner or immediately if any problems.

Tr. 223 (emphasis added).

On March 12, 2003, Velasquez returned for a follow up with Dr.Murnik.  Tr. 221.  Dr.

Murnik noted:

Mrs. Velasquez is a 53-year-old woman with a history of poorly controlled type II diabetes mellitus which **had been adequately controlled previously**.  The patient feels a little bit better having added Glucotrol XL 5 mg. last visit but still not 100%.  **Sugars are significantly better** in the 166 to 300 range, rather than consistently in the 300+ range but still not near target.

**MEDICATIONS:**

15

1.      She is currently taking Metformin 100 mg. po b.i.d.
2.      Glucotrol XL 5 mg. po q. AM.

Th patient is not eating much.  She occasionally eats some breakfast.  She has a rare lunch, sometimes an apple.  She gets tired around dinnertime about 3 o'clock.  When she is at bingo she orders a tuna sandwich.  <u>Her fingerstick glucose this morning was 166 taken about 5 o'clock.  This is followed up by evening before she goes to bed with sugars of 300 seven hours after she eats a small meal.  She need to lose weight.  She states that polydipsia and polyuria are [de]creased  by (sic) still somewhat present</u>.

**OBJECTIVE:**
Blood pressure: 120/67
Weight: 155 pounds (down 4 pounds from last visit)
Respiratory rate: 16
Temperature: 97
She is a well developed, well nourished an appropriate woman in no acute distress.

**IMPRESSION & PLAN:**
1.      Type II diabetes mellitus uncontrolled.  We will increase Metformin to the effect 1-gram b.i.d. and increase Glucotrol XL to 10 mg. qd to try and get good control more acutely.
2.      Follow up in one week, sooner immediately if any problems.
3.      Reviewed pathophysiology diabetes and explained the weight loss, explained what to do if she gets low blood sugars anytime day or night if any problems, otherwise follow up in one week.

Tr. 221(emphasis added).

On May 14, 2003, Velasquez returned for a follow up with Dr. Murnik.  Tr. 219.  Dr.

Murnik noted, "**blood sugars much improved in the 90 to 117 range**." *Id.*  Dr. Murnik further

noted:

**IMPRESSION/PLAN:**
1.      Type 2 diabetes mellitus– **much improved control with increased Glucotrol**, however, is gaining weight, has not altered diet or exercise, much because feels fatigued and tired all the time. **Recommend increased exercise and activity, weight bearing exercise, walking ideal for multiple reasons.  May be able to decrease medications if can improve dietary and exercise control.  Calories in, calories out and medications**.
2.      Osteopenia of the lumbar spine but not of the proximal femur– will add calcium and vitamin D and weight bearing exercise.
3.      Seizures– persist (sic) hypersomnolence.  Will order an EEG which hopefully [will] be done prior to Neurology visit which will give them more data to work with. Association with trauma earlier in life, does sound like seizure problems.  If has had

16

seizures, should not be driving.  Follow up in one month, sooner immediately [if] any problems.

Tr. 219 (emphasis added).

On June 25, 2003, Velasquez returned for her follow up.  Tr. 217.  Dr. Murnik noted:

**HISTORY OR PRESENT ILLNESS:**
Ms. Velasquez is a 54-year-old woman here following up on an EEG which is attempting to distinguish between sleep disorder and a seizure disorder.  Patient went for the EEG this morning but states she was not told that she needed to be sleep deprived and so had a good night's sleep last night and was rescheduled for mid to late July, which unfortunately, will be after her Neurology appointment, but that is what we have to work with.  **She is without specific complaints this time other than a chronic low back coccyx pain**.  The patient states she had [fallen?] at work 12 years ago, landed on her butt hurting her coccyx and has persistent pain since that time.  It seems worse the last year or so, particularly when she sits for prolonged periods.  She denies any radicular pain.  Pain is midline mostly related to the sacrum and coccyx. She has been taking ibuprofen without relief.  **Otherwise, without complaints**.

PHYSICAL EXAMINATION:
well developed, well nourished woman, appropriate in no acute distress.  Tenderness about sacrum in midline. **Symmetric deep tendon reflexes, normal gait, symmetric strength without muscle wasting or weakness**.

X-RAYS:
X-rays of the lumbosacral spine without evidence of mets or fracture.  **In fact, very little degenerative joint disease**.  There is some minimal mis-alignment L-5, S-1 but **nothing to explain patient's complaints**.

ASSESSMENT AND PLAN:
1.      54-year-old woman with sleep disorder versus seizure disorder.  EEG was rescheduled and neurology appointment follow up.  Patient has already seen the sleep clinic.  Follow up results as appropriate.
2.      Chronic sacral coccyx pain, likely ligamentous and/or muscular as plain films are within normal limits.  Will discontinue ibuprofen and start Naprosyn 500 b.i.d. and refer to physical therapy stretching, strengthening and modalities treatments.
3.      Follow up after EEG in neurology.  Sooner immediately any problems.

Tr. 217 (emphasis added).

17

On June 30, 2003, Velasquez underwent a diagnostic nocturnal polysomnogram at the

Sleep Clinic.  Tr. 214-216.  The results indicated as follows:

> **IMPRESSIONS AND INTERPRETATION**:  Abnormal adult nocturnal polysomnogram
> consistent with:
> 1. Nocturnal hypoxemia with oxygen saturation often falling into the upper 70's, low
>    80's during REM sleep.
> 2. Obstructive sleep apnea– hypopnea syndrome with a mean of 17.7 respiratory
>    disturbances per hour of sleep, 4.6 per hour if new adult Medicare guidelines were
>    used to score the study.  Respiratory events could cause arterial oxygen desaturation
>    as low as 75% were not associated with nocturnal hypercapnia but heavy snoring.
>    Respiratory events were much worse during REM sleep, especially supine.  In
>    view of the patient's complaints of unrefreshing sleep, frequent nocturnal
>    awakenings, cognitive impairment and excessive daytime sleepiness awake,
>    repeat nocturnal polysomnogram with a trial of CPAP (continuous positive
>    airway pressure– most common treatment for sleep apnea) (or if needed
>    BiPAP)  is clinically warranted.
>
> **RECOMMENDATIONS**:
> 1. Discussed this preliminary report with Deborah Anaya, Sleep Medicine CNP, who
>    will schedule a follow-up appointment with this patient to discuss the results of the
>    study and then a nasal CPAP desensitization trial if needed prior to scheduling a
>    repeat nocturnal polysomnogram with a trial of nasal CPAP.  It is very possible with
>    CPAP that we will be able to ventilate the patient without requiring supplemental
>    oxygen when sleeping.
> 2. Encouraged Ms. Anaya, CNP, to review results of the EEG, pulmonary function tests
>    and consider the risks and benefits and cardiac Echo.

Tr. 215-216.

On June 30, 2003, Madeleine Grigg-Damberger, M.D., a Board Certified Neurologist,

evaluated Velasquez in the Adult Epilepsy Clinic.  Tr. 210-213.  Of significance, Velasquez

denied "excessive daytime sleepiness or daytime napping."  Tr. 211.  Velasquez also reported

smoking ½ pack of cigarettes per day.  Velasquez complained of "weight loss, night sweats,

fatigue, poor appetite, blurred vision, eye pain, droopy eyelids, loss of hearing, ringing in her ears,

night time shortness of breath, asthma, abdominal pain, constipation, frequent urination, diabetes

mellitus, depression, painful joints all over, poor memory, frequent headaches (none reported),

18

loss of balance and dizziness." *Id.* Dr. Damberger ordered an EEG. Dr. Damberger opined "suggestive of possible sleep apnea, memory complaints could be due, in part, to her diabetes mellitus, epilepsy, sufficient amount of bronchial asthma causing pulmonary complaints at night." Tr. 212. Dr. Damberger directed Velasquez to return in two weeks for a follow up.

On July 15, 2003, presented to the Physical Therapy department for an evaluation. Tr. 208-209. Heidi Gober, a physical therapist, evaluated Velasquez. Ms. Gober noted Velasquez was obese and walked with a slow antalgic gait. Tr. 208. Ms. Gober performed a physical examination and assessed Velasquez as having an "SI (sacroiliac) dysfunction with right anterior innominate with leg length discrepancy." Tr. 209. Ms. Gober opined rehabilitation was fair and prescribed one to two visits per week for four weeks for manual muscle energy techniques, stretching and progressive lumbar stabilization and strengthening. Ms. Gober set the following goals: 1) pt will have resolution of leg length discrepancy in 3 weeks; 2) pt will demonstrate independence with HEP (home exercise program) for self-moderation of SI dysfunction in 3 weeks; and 3) pt will demonstrate 25% increase in lumbar extension in 3 weeks. *Id.*

On August 13, 2003, Ms. Gober noted Velasquez had completed 5 visits, from July 14, 2003, to August 6, 2003. Ms. Gober further noted:

> **SUMMARY:** Treatment consisted of manual/muscle energy techniques for R anterior innominate, stretching, cardio exercise and progressive abdominal/lumbar stabilization HEP. She has met 2/3 goals established with report that she is sitting with decreased back pain and is independent with her HEP. Her leg length is symmetrical. Her lumbar ROM remains somewhat restricted. She continues to report tailbone pain that has only moderated slightly. I discussed with her and gave her a list of community centers where she could continue exercising and also pool therapy available in the community.

Tr. 206 (emphasis added).

On August 18, 2003, Dr. Damberger wrote a letter to Dr. Murnik informing him of her

findings.  Tr. 203-204.  Dr. Damberger noted in part:

> I reviewed the results of her sleep study today.  Of note, she managed to forget her follow-up
> appointment with Debbie Anaya to review the results.  It was abnormal consistent with
> nocturnal hypoxemia with oxygen saturations falling to the upper 70s and 80s during REM
> sleep in a woman that may have some underlying pulmonary disease.  She additionally had
> a mean of 18 obstructive apneas and hypopneas per hour of sleep, only five per hour if new
> adult Medicare guidelines were used to score the study.  However, these events could cause
> arterial oxygen desaturation as low as 75% then accompanied by heavy snoring but no
> nocturnal hypercapnia.  In view of the patient's complaints of unrefreshing sleep, frequent
> nocturnal awakenings, cognitive impairment, and excessive daytime sleepiness awake, a repeat
> nocturnal polysomnogram with a trial of nasal CPAP if clinically warranted.  Dr. Anaya was
> also going to consider at my request pulmonary function tests.  The patient is now rescheduled
> for a visit with Dr. Anaya, and I again discussed the issues about nasal CPAP.  <u>X-rays of the
> lumbar spine were done June 20, 2003, not at my request, and it showed mild
> degenerative changes with normal limits for age with no subluxation</u>.  Minimal
> atherosclerotic calcification of her aorta was observed then.  <u>The EEG done July 22,
> 2003, interpreted by myself and Fellow, Dr. Bryniarski, was normal in waking and
> sleep</u>, save increased beta activity which may reflect medication effects.  EKG done
> on June 30, 2003, showed sinus bradycardia and nonspecific ST wave abnormalities.
> <u>When compared with July 23, 2003 EKG, no significant changes observed</u>.
>
> IMPRESSION:
> A 54-year-old woman who complains in the last approximately five to six months ago
> of vague alterations in cognition not especially suggestive of epileptic seizures because
> of relatively preserved consciousness during them.  A recent sleep study documents
> significant sleep-related breathing disorder both obstructive and accompanied by
> nocturnal hypoxemia.  This warrants consideration of underlying pulmonary disease
> and treatment of her sleep-related breathing disorder.
>
> RECOMMENDATIONS:
> 1.    I encouraged her to follow up with Debbie Anaya, CNP, at the Sleep Disorder
>        Center to discuss repeat nocturnal polysomnogram with a trial of CPAP or
>        BiPAP after a nasal CPAP desensitization trial.
> 2.    <u>I encouraged physician-supervised weight reduction/exercise program,
>        screening for hypothyroidism if not recently done</u>.
> 3.    I encourage referring physicians and nurse practitioner <u>review the pulmonary
>        function tests done June 2003, which were within normal limits</u>.  May
>        consider chest x-ray if not already done.  <u>I suspect we will not find a good
>        cause for the nocturnal hypoxemia during REM sleep save obesity
>        hyperventilation</u>?
> 4.    <u>Best approach I believe in this patient would be to treat her underlying sleep
>        apnea and see if other symptoms improve</u>.  Perhaps  her little near blackouts

lately have been micro sleeps due to excessive daytime sleepiness from untreated obstructive sleep apnea of a moderate-to-severe degree.

Tr. 203-204 (emphasis added).

On September 25, 2003, Debby Anaya, CNP, wrote a letter to Dr. Murnik.  Tr. 201.  Ms. Anaya informed Dr. Murnik about the need to schedule Velasquez for a second night for a full titration of CPAP.  Ms. Anaya noted:

ASSESSMENT AND PLAN:
1.   Obstructive sleep apnea:  The patient is to be scheduled for a second night full titration.  At this time, the patient opts not to do a day desensitization because it is **too difficult for her to come in during the day as she is watching her daughter's children**.  She is currently scheduled for her full titration on 10/22/03.  She will then be seen subsequently in the clinic for follow up on November 13 at 9 a.m.
2.   Syncopal episodes:  These are still unclear as to whether they are neurologic or cardiac in etiology.  She has been seen by Madeleine Grigg-Damberger, M.D., in Neurology and at this time we will go ahead and consider somewhat of a cardiology workup as well.
3.   Questionable pulmonary hypertension:  The patient is to be scheduled for a 2-D echocardiogram.  At this time, the patient is to return to the clinic 3 weeks after her polysomnogram for setup of CPAP.

Tr. 201-202 (emphasis added).

On October 21, 2003, Velasquez returned for a follow up with Dr. Murnik.  Tr. 196.  Dr. Murnik noted she had "undergone evaluation by neurology and sleep study lab" and "it [was] felt that she has obstructive sleep apnea."  *Id.*  Dr. Murnik also noted Velasquez was to be fitted for a CPAP trial the following day.  Of significance, Dr. Murnik noted "patient's diabetes is **mildly** out of control" with "[f]inger stick glucoses in the **150-180 range for about one month**."  *Id.*  Dr. Murnik assessed her as follows:

ASSESSMENT/PLAN:
Obstructive sleep apnea.  Strongly encouraged use of the CPAP.  Encouraged the CPAP trial.  Acknowledged that this sometimes takes getting used to.  It may help a great deal with a lot of her complaints.  Energy complaints, memory complaints, general body aches, diabetic control.  Everything may be improved by adequate oxygenation.  Abdominal discomfort.  Chronic.  Abdominal discomfort from esophagus to rectum without fever, gross blood.  May

21

be a combination of things, but suspect anxiety related gastroesophageal reflux disease. Possible also has a family history of stomach cancer.  Guaiac positive stools.  Concerning for GI pathology, though symptoms most consistent with irritable bowel syndrome.  Refer to gastroenterology.  Anticipate will need EGD and colonoscopy.  Follow up worse, if not better, or if any problems.

Tr. 196.

On October 22, 2003, Velasquez returned to the Sleep Clinic.  Tr. 198-199.  The sleep study indicated she had "obstructive sleep apnea syndrome with best response to CPAP at 16 cm of water."  Tr. 199.  Lee K. Brown, M.D., recommended Velasquez start on "CPAP at 16 cm of water using the above-specified mask."  *Id.*  Dr. Brown advised Velasquez to avoid alcoholic beverages at bedtime and directed that she "should not be prescribed respiratory depressant medications unless and until she is reliably using CPAP."  *Id.*  Dr. Brown also recommended she lose weight.

On November 17, 2003, Velasquez went to University Hospital Emergency Center with complaints of "out of control blood sugars, steady increase in BG since Aug[ust] and nausea and stomach discomfort with eating for 1 ½ months, diarrhea for 3-4 days."  Tr. 189-195.  Her CBG was 349 at around 8:00 p.m.  The physician assessed her with hyperglycemia and gastroenteritis and directed her to follow up with Dr. Murnik.

On November 20, 2003, Velasquez returned for a follow up with Dr. Murnik.  Tr. 187. Dr. Murnik reviewed the urinalysis done at the emergency room and noted it was positive for nitrites and bacteria.  Dr. Murnik further noted:

**ASSESSMENT**:
1.    54 year-old woman with mild asthma, increase p.r.n. Albuterol use, encourage p.o. hydration.
2.    Poorly controlled type II diabetes mellitus.  Feels out of control secondary to asthma exacerbation and likely urinary tract infection.  The patient has dysuria (painful urination) in addition to polydipsia, polyuria and dirty looking urine.  Will treat with

22

Bactrim double strength, 1 p.o. b.i.d. x 10 days.  Follow up in one week or sooner if any problems.  Continue chronic medications.

Tr. 187.

On November 26, 2003, Velasquez returned for her follow up with Dr. Murnik.  Tr. 185.

Dr. Murnik noted:

**SUBJECTIVE:**
The patient is a 54 year-old woman here to follow up on an asthma exacerbation.  She much improved.  Follow up on UTI (urinary tract infection), much improved.  Still taking antibiotics.  And to follow up on poorly controlled type 2 diabetes mellitus, which has not improved.  The patient also complains of epigastric discomfort which she describes as hot, mild feeling of needing to vomit.  And complains about her CPAP machine, had follow up with the Sleep Lab on Decembe 9.  The patient feels the air is too hot, the pressure is too high, and it is making breathing worse rather than better.  The patient has been using her albuterol with increasing frequency, had discussion last time and feels much improved.  CBGs in the 200 to 300 range.  With today mild improvement, actually.
**   **   **   **   *

**ASSESSMENT/PLAN**
A 54 year-old woman with poorly controlled type 2 diabetes mellitus.  Will re-refer to Wellness Center for recommendations regarding diet.  Will do a trial of Nexium, consider Reglan to assist her.  Could potentially represent diabetic gastroparesis.

Tr. 185.

On December 9, 2003, Ms. Anaya wrote Dr. Murnik a letter, informing him of her findings

regarding Velasquez's follow up at the Sleep Disorder Center for her CPAP usage.  Tr. 183-184.

Significantly, Ms. Anaya noted Velasquez's compliance was poor.  Ms. Anaya noted as follows:

We saw your patient, Nancy Velasquez, at the Sleep Disorder Center for follow up of her CPAP usage.  Ms. Velasquez is currently on CPAP at 16 centimeters of water pressure.  She was set up with her CPAP on November 13, 2003, and comes back for her first follow up visit.  Downloading her compliance meter shows that she did use her CPAP at minimum 4 hours a night for the first 5 nights, but thereafter showed **minimal usage**.  We did discuss this and she states that she has been having problems dealing with cold air from the CPAP machine.  The machine was checked by Lonnie Hoggenmiller, respiratory therapist from A&R Medical Supply company.  Ms. Velasquez has turned her heater down to the lowest setting.  She was instructed how to reset her heater and indeed it was reset at a setting of 3 today.  The patient was instructed regarding the ramp button as well.

**   **   **   **   **

23

ASSESSMENT/PLAN:
1.      Obstructive sleep apnea.  The patient's heat was increased to a setting of 3.
2.      The patient was instructed to use her ramp generously to slowly acclimate to the pressure of 16.
3.      At the present time, she is having no problems with her mask fitting, therefore she is to return to clinic the 2nd or 3rd week of January for follow up.  At his time, the patient is scheduled for January 3, so that we can download her compliance monitor at that time and see her hourly usage on her CPAP machine.

Tr. 183 (emphasis added).

## B.  Credibility Determination

Credibility determinations are peculiarly the province of the finder of fact and will not be upset when supported by substantial evidence.  *Diaz v. Secretary of Health and Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990).  "Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."  *Huston v. Bowen,* 838 F.2d 1125, 1133 (10th Cir. 1988).  However, the ALJ's credibility determination does not require a formalistic factor-by-factor recitation of the evidence.  *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000).  The ALJ need only set forth the specific evidence he relies on in evaluating claimant's credibility.  *Id.*  The ALJ may also consider his personal observations of the claimant in his overall evaluation of the claimant's credibility.  *Id.*

In evaluating a claimant's credibility regarding pain, the ALJ must consider the level of medication the claimant uses and its effectiveness, the claimant's attempts to obtain relief, the frequency of medical contacts, the claimant's daily activities, subjective measures of the claimant's credibility, "and the consistency or compatibility of nonmedical testimony with objective medical evidence."  *Kepler v. Chater*, 68 F.3d 387, 391 (10th 1995) (quotation omitted).  The inability to work pain-free is not sufficient reason to find a claimant disabled.  *See Gossett v. Bowen*, 862 F.2d 802, 807 (10th Cir. 1988).

Velasquez claims the ALJ's credibility finding is not "closely and affirmatively linked to substantial evidence."  Pl.'s Mem. in Support of Mot. to Reverse at 18.  In her decision, the ALJ found:

> After considering the evidence of record, I find that the claimant's medically determinable impairments could have been reasonably expected to produce the alleged symptoms, **but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible**.

> The claimant has a remote history of two right shoulder surgeries, in 1991 and 1992, **but has not required any treatment other than occasional non-steroidal pain medications since**. She has not undergone further surgery or even physical therapy.  Although the claimant alleges disability beginning December 15, 1999, it was not until February 16, 2001, that she was seen by Robert Schenck, M.D., an orthopedist, for her right shoulder pain (Ex. 4F/26). Examination showed internal rotation to T12 on the affected right shoulder and on the left to T10.  **Strength was normal**.  She had definite AC joint tenderness.  Cross arm adduction was positive.  O'Brien's test was positive.  **Dr. Schenck obtained x-rays of her right shoulder, which her interpreted as showing mild glenohumeral degenerative changes, AC joint changes, and a type II acromion, although the radiologist interpreted them as normal (Ex. 4F27 and Ex. 4F/13)**.  Dr. Schenck noted that the claimant was "fairly symptomatic" and r**ecommended a course of physical therapy and use of Celebrex, after which surgery might be considered.  However, the claimant did not follow through with physical therapy or immediately return to Dr. Schenck**.  She did tell her primary care physician on March 14, 2001, that she had been experiencing daily muscle pain and spasms in her upper back/shoulder for about 6 months (Ex. 4F/24).  She was advised to use warm packs, stretching exercises, and NSAID's (Ex. 4F/25).  When the claimant next presented to her primary care physician, on January 10, 2002, neither the claimant nor the physician mentioned shoulder or back pain (Ex. 4F/17).  On February 21, 2002, she complained to her primary care physician of right shoulder pain and was advised to use Extra Strength Tylenol (Ex. 4F/15).

> The claimant presented to the emergency room on July 23, 2002, complaining of neck and right shoulder pain and was diagnosed as having muscle strain to the right neck and upper back (Ex. 4F/4 and 5).  **The claimant did not seek further treatment for her complaint of right shoulder pain prior to her date last insured of December 31, 2002**.  However, she did return to Dr. Schenck on January 31, 2003, and the report of that visit is relevant in so far as it casts light on the claimant's condition prior to her date last insured (Ex. 11F/44).  **The claimant told Dr. Schenck that the purpose of her visit was to obtain a letter to aid her in obtaining disability benefits, which Dr. Schneck declined to provide. The claimant told Dr. Schenck that her right shoulder did not have limitation of strength or motion, but that she did have pain with extended periods when working with her hands in front of her**.  She stated that her pain limited her ability to work.  She stated that she was not able to work 8 hours and changed to 6 hours of work, but then was unable to work for this period of time.  She felt that working less than 6 hours was not worth her time.  **Examination**

**confirmed good range of motion and normal strength in her right upper extremity. Dr. Schenck obtained x-rays of her right shoulder, which he interpreted as revealing no evidence of significant osteoarthritis.** There was evidence of a previous distal clavicle excision, which appeared adequate. Dr. Schenck indicated to claimant that she most definitely would have some residual pain, which she would have to learn to live with. **The claimant did not request any pain medication**.

Tr. 314-315 (emphasis added).

It is clear the ALJ cited extensively to the record to support her credibility determination. Dr. Schenck's medical notes for February 17, 2001, indicate Velasquez listed Premarin as the **only** medication she was taking at that time. Tr. 147. Dr. Schenck's physical examination also revealed forward flexion to 170 bilaterally, strength of 5/5, negative straight leg raise bilaterally, deep tendon reflexes of 2+, normal strength, and normal heel and toe walk. *Id.* Moreover, on January 31, 2003, Velasquez returned to see Dr. Schenck. At that time, Dr. Schenck noted:

> The patient states that <u>she is here today to obtain a letter stating that her right shoulder pain is related to her original accident at work</u>. This accident was now more than 10 years ago. <u>The patient desires to have this note so that she can receive disability payments</u>. She spoke with somebody with regards to this process, she is not sure whether it is a lawyer or not.

Tr. 255 (emphasis added). Significantly, Velasquez reported "her right shoulder pain does not have limitation of strength or motion." *Id.* Velasquez denied any weakness or numbness in the extremities. The physical examination revealed her right and left shoulders had forward elevation to 180 degrees, 50 degrees of external rotation bilaterally, internal rotation to T8 bilaterally, 5 out of 5 strength to supraspinatus and subscapularis testing, 5 out of 5 strength of the biceps, and had light touch sensation throughout the right upper extremity. Velasquez did have "some mild pain with cross arm adduction." *Id.* Dr. Schenck ordered x-rays of the right shoulder which "reveal[ed] no evidence of significant osteoarthritis." *Id.* Drs. Schenck and Schwarting opined "these were normal postoperative pains, which we have all encountered in our practices." Tr. 226. Dr. Schenck noted Velasquez was "not requesting any pain medication today." *Id.*

Velasquez also complains the ALJ disbelieved her "because [her] allegations of shortness of breath upon exertion were not supported by the treatment records." Pl.'s Mot. to Reverse at 17. Velasquez claims "[t]he ALJ failed to discuss the evidence that she has difficulty walking." *Id.* In this regard to Velasquez's complaints of shortness of breath, the ALJ noted:

On March 31, 1998, the claimant presented to the emergency room complaining of shortness of breath, and was diagnosed as having probable asthma (Ex. 2F/2). She was prescribed Albuterol and Beclovent. On March 14, 2001, the claimant presented complaining that her asthma symptoms had worsened over the years, and that she often awakened at night due to asthmatic symptoms (Ex. 4F/24). She also complained of daily exacerbations, for which she used Albuterol and Azamacort MDI inhalers (she was obtaining small amounts of medication from other). However, she denied visits to the emergency room or hospitalizations for asthma. On examination, she had good air movement in her lungs, increased expiratory sounds bilaterally, particularly with cough, but without rhonchus, rales, or wheezes. The claimant was prescribed an Albuterol measured dose inhaler and an Azmacort measured dose inhaler, and advised to stop smoking. The claimant did not return until January 10, 2002, when she present for newly diagnosed diabetes, and was incidentally advised to take her Azmacort steadily as prescribed and not as needed, and to use the Albuterol as a rescue medication. On February 21, 2002, her asthma was described as "quiescent at present (Ex. 4F/15). On September 30, 2002, she reported that she had just begun using Advair 2 days ago (Ex. 4F/14). There was no mention of asthma symptoms at her next visits, on October 30, 2002 and on February 26, 2003 (Ex. 5F/5 and Ex. 5F/14, Ex. 11F/42).

The claimant's testimony that she runs out of breath walking to her car is not supported by these treatment records. Furthermore, her physicians repeatedly urged her to exercise more, and specifically to walk more, to improve control of her diabetes, with no mention of any difficulty with exercising or walking due to shortness of breath (Ex. 4F/15 and Ex. 5F/14, Ex. 11F/44). At any rate, it appears reasonable to limit her to light work not involving concentrated exposure to respiratory irritants such as fumes, odors, dusts, and gases.

With regard to the claimant's episodes of somnolence or syncope, she admits that these have occurred since she was a young woman, and gives no indication that they have increased in frequency (Ex. 11F/29, 33, and 38). **Her statements regarding their frequency are somewhat inconsistent, but she told the neurologist who performed her sleep study in July 2003 that she had experienced one approximately 4 months ago, another 3 months ago, and perhaps before that 10 years ago (Ex. 11F/29). These extremely rare events did not prevent the claimant from performing substantial gainful activity in the past.** Furthermore, she continues to drive, despite her non-compliance with the CPAP machine and despite physicians' orders not to do so (Ex. 5F/14 and Ex. 11F/38). She also reported on September 25, 2003 that she watched her daughter's children during the day (Ex. 11F/20). On July 6, 2005, she told a doctor that she was taking care of her grandchildren for the summer, currently had four with her, and was planning on going to the pool today (Ex. 13F/2). It certainly appears reasonable to restrict the claimant from performing work that

involves exposure to unprotected heights and hazardous moving machinery, even though she continue to drive a car.

Tr. 317.   A review of the evidence supports the ALJ's findings.   Nonetheless, Velasquez maintains she had difficulty walking.   However, as late as **June 25, 2003**, Dr. Murnick examined Velasquez for "chronic low back coccyx pain" and found "symmetric deep tendon reflexes, **normal gait**, **symmetric strength without muscle wasting or weakness**."   Tr. 217.   Significantly, Dr. Murnick referred to Velasquez's x-rays of the lumbosacral spine noting, **"very little degenerative joint disease . . . some minimal mis-alignment L-5, S-1 <u>but nothing to explain patient's complaints.</u>**"   *Id.*   Dr. Murnick assessed Velasquez with "**likely ligamentous and/or muscular as plain films are within normal limits**."   *Id*.

The ALJ also considered the opinions of the agency's medical consultants.   The ALJ noted:

> As for the opinion evidence, I have given great weight to the opinions of the non-examining state agency physicians that prior to her date last insured, the claimant had the residual functional capacity to lift and carry 20 pounds on an occasional basis and 10 pounds on a frequent basis, to stand and/or walk (with normal breaks) for total of about six hours in an 8-hour workday, and to sit for about six hours in an 8-hour workday (Ex. 6F).   Her abilities to push and/or pull with her upper and lower extremities were unlimited to the extent that they were consistent with the strength limitations previously stated.   She was limited to reaching overhead with her right upper extremity no more than occasionally.   She had no visual limitations and no communicative limitations.   I have, of course, added further restrictions to this assessment based on the claimant's hearing testimony.

> Allen R. Gelinas, M.D., the orthopedic surgeon who treated the claimant for her residual right shoulder problem following her surgeries in 1991 and 1992, released the claimant in December 1994 to return to light to medium work, avoiding overhead work (Ex. 1F/6).   Dr. Schenck, the orthopedist who saw the claimant in February 2001 and January 2003, declined to provide a disability statement (Ex. 11F/44).   Michael Murnick, M.D., the claimant's primary physician, did not indicate any particular restrictions of the claimant's abilities.

Tr. 317.

28

The record also supports the ALJ's observations that Velasquez cared for her

grandchildren during the day in 2003 and the summer of 2005.  Tr. 201 ("At this time, the patient

opts to do a day desensitization because it is too difficult to come in during the day as she is

watching her daughter's children." ); Tr. 373 ("is taking care of  grand kids for the summer . . .

currently has 4 with her and is planning to go to the pool today").

The ALJ's assessment of Velasquez's credibility is legally sufficient because the ALJ gave

specific reasons for rejecting her subjective complaints.  *See White v. Barnhart*, 287 F.3d

903, 909 (10th Cir. 2001).  In making her credibility determination, the ALJ relied on the

treatment Velasquez received and the frequency of that treatment, noncompliance with the

prescribed treatment, and the fact that Velasquez was able to care for her grandchildren as reported

in 2003 and during the summer of 2005.  The ALJ also considered the opinions of the agency's

medical consultants.  Accordingly, the Court will not disturb the ALJ's credibility findings.

## C.  RFC Determination

Residual functional capacity is defined as "the maximum degree to which the individual

retains the capacity for sustained performance of the physical-mental requirement of jobs."  20

C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(c).  In arriving at an RFC, agency rulings require an ALJ

to provide a "narrative discussion describing how the evidence supports" his or her conclusion.

See SSR 96-8p, 1996 WL 374184, at *7.  The ALJ must "discuss the individual's

ability to perform sustained work activities in an ordinary work setting on a regular and continuing

basis . . . and describe the maximum amount of each work-related activity the

individual can perform based on the evidence available in the case record."  *Id.*  The ALJ must also

explain how "any material inconsistencies or ambiguities in the case record were considered and

29

resolved." *Id.* "The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence." *Id.*

In her decision, the ALJ found:

> After careful consideration of the entire record, I find that, <u>through the date last insured</u>, the claimant had the residual functional capacity to lift and carry 20 pounds on an occasional basis and 10 pounds on a frequent basis. She could stand and/or walk (with normal breaks) for a total of about six hours in an 8-hour workday. Her abilities to push and/or pull with her upper and lower extremities were unlimited to the extent that they were consistent with the strength limitations previously stated, except that with her right upper extremity she should push and/or pull no more than occasionally. She should never climb ropes. ladders, or scaffolds. She could balance, stoop, kneel, crouch, and crawl on an occasional basis. She had no manipulative limitations, except that she couldn't handle or finger on more than a frequent basis. She was limited to reaching overhead with her right upper extremity no more than occasionally, and couldn't perform work that required sustained (with no interruption or more than 15 minutes at a time without opportunity to move her arms) reaching in front of her. She hd no visual limitations and no communicative limitations. She should avoid concentrated exposure to hand held vibrating tools, to respiratory irritants such as fumes, odors, dusts, and gases, and to unprotected heights and hazardous moving machinery.

Tr. 313. The ALJ then sent forth the evidence, citing extensively to the record, to support her RFC finding. *See* Tr. 313-317.

Velasquez contends the ALJ's RFC finding is contrary to substantial evidence. Velasquez claims the ALJ failed to include her fatigue, vision problems and loss of concentration in her RFC determination. Velasquez claims she "has asthma, which causes her to be out of breath; diabetes, which causes her fatigue, digestive problems, and vision issues; and old shoulder injury that affects her ability to use her arms and hands; and arthritis in her joints, which causes her generalized pain." Pl.'s Mem. in Support of Mot. to Reverse at 10. However, Velasquez fails to cite to the record to support her claims.

Velasquez's insured status for disability insurance benefits expired on December 31, 2002. Thus, Velasquez must establish that she was disabled on or before that date.

**1. Asthma**

 The record indicates Velasquez's asthma was "quiescent" on February 21, 2002 (Tr. 136), her chest x-rays were normal on June 18, 2002 (Tr. 134), a physical examination revealed her lungs were clear to auscultation on September 30, 2002 (Tr. 163), and her medical history indicates her asthma was controlled with medications.  The record also indicates Velasquez's asthma was only problematic when she did not take her medications as prescribed.  Tr. 114-117 (March 31, 1998– treating her asthma with other family member's medication); Tr. 145-146 (March 14, 2001– reported relief of asthmatic symptoms with Albuterol and Azmacort but unable to purchase them and was "borrowing them from her family and friends"); Tr. 138-139 (January 10, 2002–  "last seen about a year ago for asthma refills . . .  patient encouraged to take her Azmacort steadily as prescribed not PRN"); Tr. 136 (February 21, 2002–  Velasquez reported asthma was under better control; Dr. Murnik noted "asthma quiescent at present"); Tr. 163 (September 30, 2002– Lungs clear to auscultation.); Tr. 223 (denies shortness of breath).

**2. Vision**

On January 7, 2002, Velasquez reported a change in her vision with decreasing acuity.  Tr. 149.  On that day, Velasquez had a capillary blood glucose of 358 which would account for her visual problems.  The emergency room physician diagnosed her with diabetes, prescribed Glucophage, and referred her to Dr. Murnik.

On January 10, 2002, Velasquez kept her follow up appointment with Dr. Murnik.  Tr. 138-139.  Velasquez reported her mother had performed a capillary blood glucose that morning

31

with a reading of 133.  Velasquez had not yet taken the Glucophage.  Dr. Murnik noted, "The patient has no complaints at present."

On February 21, 2002, Velasquez returned for her follow up with Dr. Murnik.  Tr. 136. Velasquez reported her vision was better and she had acquired reading glasses.  Velasquez also reported she had not picked up all her medications due to financial problems and was sharing her mother-in-law's medications. Velasquez's capillary blood glucose was "120 fasting" that morning. Velasquez reported the vast majority of her capillary blood glucose since February 1, 2002, were in the 80-120 range.

On October 30, 2002, Velasquez reported "she had been in relatively good control until a month or so ago" when she was "found to have an asymptomatic urinary tract infection."  Tr. 154. On that day, Velasquez did not complain of visual problems.

A review of the record indicates Velasquez did not complain about visual problems again until February 26, 2003 when her diabetes was again poorly controlled.  At that time, Velasquez's capillary blood glucose was 327.  Dr. Murnik added Glucotrol XL for better control of her diabetes.

On March 12, 2003, Velasquez returned for a follow up with Dr. Murnik.  Tr. 221.  Dr. Murnik noted "history of poorly controlled type II diabetes mellitus which **had been adequately controlled previously**."   Velasquez reported feeling "better with the Glucotrol but still not 100%." Dr. Murnik increased her Metformin and Glucotrol XL [dosages]"to try and get good control more acutely."  *Id.*

On May 14, 2003, Velasquez returned for a follow up with Dr. Murnik.  Tr. 219.  Dr. Murnik noted, "blood sugars much improved in the 90 to 117 range" and "much improved control with increased Glucotrol."  *Id.*  Velasquez did not complain of visual problems on that day.

On February 23, 2004, Velasquez reported to Ms. Lich that "her blood sugars had been running 70-124 fasting."  Tr. 237.  Ms. Lich assessed Velasquez as having "Diabetes type 2 controlled.  *Id.*  Velasquez did not complain of any visual problems.

On May 2, 2004, Rachel B. Evans, M.D., evaluated Velasquez.  Tr. 463-464.  On that day Velasquez reported "her sugars have been well controlled."  Tr.463.  Dr. Evans assessed Velasquez as "a 55-year-old female with a history of type 2 diabetes that is fairly well controlled." Tr. 464.  Velasquez did not complain of any visual problems.

Thus, the record indicates Velasquez experienced visual problems when her capillary blood glucose was elevated.  However, when her blood glucose was adequately controlled, she did not complain of visual problems.

**3.  Fatigue**

Velasquez first reported experiencing fatigue on **February 26, 2003**.  Tr. 223.  On that day, her capillary blood glucose was 327.  Velasquez reported fatigue for the "last three months."  On March 12, 2003, Velasquez reported "get[ting] tired around dinnertime about 3 o'clock."  Tr. 221. On May 14, 2003, with her blood sugars in the 90 to 117 range, Velasquez reported she had "not altered her diet or exercise" because she felt "fatigued and tired all the time." Tr. 219.  On that day, Dr. Murnik noted, "recommend increased exercise and activity, weight bearing exercise,  walking ideal for multiple reasons.  May be able to decrease medications if can improve dietary and exercise control.  Calories in, calories out and medication."  *Id.*

On October 21, 2003, Dr. Murnik noted Velasquez had been assessed with obstructive sleep apnea and was to be fitted for a CPAP trial on October 22. Tr. 196. Dr. Murnik strongly encouraged Velasquez to use the CPAP noting, "[i]t may help a great deal with a lot of her complaints. Energy complaints, memory complaints, general body aches, diabetic control. Everything may be improved by adequate oxygenation." *Id.* However, on December 9, 2003, Velasquez's compliance meter showed minimal usage of the CPAP.

On January 5, 2004, Ms. Lich noted: "[S]he does complain of fatigue but feels this [is] secondary to one of her new medications that she is taking." Tr. 246.

On January 14, 2004, Ms. Anaya evaluated Velasquez in the Sleep Disorder Center. Tr. 262. Ms. Anaya noted "Ms. Velasquez's compliance monitor show that she has used her CPAP only 6 days out of 35."

On January 26, 2004, Velasquez reported to Ms. Lich that "since increasing her Lantus to 20 units every 24 hours her blood sugar has really come down." Tr. 241. Ms. Lich noted Velasquez's lab results were 119 mg/dl.

On May 2, 2004, Rachel B. Evans, M.D., evaluated Velasquez. Tr. 463-464. On that day, Velasquez reported "her sugars had been well controlled." Her capillary blood glucose was 130. Dr. Evans assessed Velasquez as "a 55-year-old female with a history of type 2 diabetes that is fairly well controlled." Tr. 464. Velasquez had no complaints of fatigue or tiredness.

On October 4, **2004**, Velasquez attended her **first session** of diabetes self-management class at the Family Practice Clinic. Tr. 419. The class included information about diabetes, the disease process, medications, testing blood sugars, pattern management and community resources.

**4. Concentration and Arthritis**

Velasquez failed to cite to the record to support her allegations that she suffered loss of concentration during the time in question and the Court has found none.  In terms of her allegations of arthritis, on February 21, 2002, Dr. Murnik noted Velasquez had osteoarthritis and "Recommend[ed] exercise, weight loss [and] Extra Strength Tylenol."  Tr. 136.   On January 31, **2003**, Drs. Schwarting and Schenck ordered x-rays, which revealed "no evidence of significant osteoarthritis."  Tr. 255.  On that day, Velasquez did not request any pain medication and reported she only had pain when she worked for extended periods with her hands in front of her.  *Id.*  On June 25, **2003**, complained of pain of chronic low back coccyx pain.  Tr. 217.  The x-rays of the lumbosacral spine showed very little degenerative joint disease.  *Id.*  Dr. Murnik opined the sacral coccyx pain was "likely ligamentous and/or muscular as plan films are within normal limits."  *Id.*  After attending five physical therapy sessions, on August 13, **2003**, the physical therapist reported Velasquez was "sitting with decreased back pain and is independent with her home exercise program."  Tr. 206.  On August 18, **2004**, that Dr. Murnik noted:

> Patient complains of pain in knees, which appears to be degenerative joint disease.  Also has some lateral tibial band syndrome.  Recommended stretching and walking.  Patient has negative straight leg raises.  Not a radicular type complaint.  Minimal tenderness over greater trochanger.  Do not think has trochanteric bursitis.  Recommending ambulation, stretching, heat and walking.

Tr. 398.  During the time in question, Velasquez never requested or required narcotic pain medication.[3]

---

[3]  The Court also notes that, during the time in question, Velasquez had difficulties buying any of her medications due to financial problems.  However, although she would have qualified for reduced or free medical services, she was hesitant to apply for financial assistance because she had failed to file income taxes for several years.  This created a situation where she was borrowing medications for her asthma and diabetes from friends and family.  It was not until February 26, 2003, that Dr. Murnik noted she was "recently back on the UNM Care Plan."  Tr. 223.

Having meticulously reviewed the record, the Court finds that the ALJ's RFC is supported by substantial evidence.  The ALJ's RFC incorporates all impairments supported by the record. The ALJ considered Velasquez's complaints of pain when she worked for extended periods with her hands in front of her and limited her reaching overhead to no more than occasionally.  The ALJ also considered Velasquez's asthma and restricted her from exposure to respiratory irritants. Finally, the ALJ considered Velasquez's rarely occurring  "syncopal episodes" by including in the RFC that Velasquez "should avoid unprotected heights and hazardous moving machinery."

**D.  Vocational Expert Testimony**

Velasquez contends the vocational expert's (VE) testimony "contained two fatal errors." Pl.'s Mem. in Support of Mot. to Reverse at 10.  With respect to her upper extremity limitation, Velasquez contends the ALJ failed to clarify an inconsistency between the limitations presented and the job requirements listed in the Dictionary of Occupational Titles (DOT).  According to Velasquez, the ALJ's second hypothetical question to the VE included the ability to push or pull occasionally with her right upper extremity; the ability to handle or finger no more than frequently; limited to overhead reaching with her right side no more than occasionally; and not able to perform sustained reaching in front of her.  The VE testified that the jobs available under this hypothetical were shipping and receiving weigher, parking lot attendant (total number reduced by 1/3), and office helper (total number reduced by 1/3).  Velasquez argues that because the ALJ restricted her ability to reach, she could not perform the office helper or parking lot attendant job, which require frequent reaching under the DOT.  Velasquez claims there is an inconsistency between the limitations presented and the job requirements listed in the DOT.  Therefore,

Velasquez contents the ALJ had a duty to ask the VE to explain the conflict before the ALJ may rely on the VE's testimony.

As the Commissioner points out, *Segovia v. Astrue*, 2007 WL 867172  (March 23, 2007), does not support Velasquez's argument.  In *Segovia*, the Tenth Circuit acknowledged that under the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles (1993) (SCO) the "reaching" requirements is defined as "[e]xtending hand(s) and arm(s) *in any direction*. *Id.* at *2.  While Segovia was limited to occasional overhead reaching, the Tenth Circuit noted the SCO did not separately classify overhead reaching.  Therefore, under the SCO, even a job requiring frequent reaching does not necessarily require more than occasional overhead reaching.  Because the VE was aware of Segovia's limitations on overhead reaching, and the Ve testified both that Segovia could perform the jobs the VE identified and that the VE 's opinion of the jobs open to Segovia was consistent with the DOT's specifications, the Tenth Circuit found the VE's testimony did not conflict with the DOT and SCO "so much as it clarifies how their broad categorizations apply to this specific case."  *Segovia*, 2007 WL 867172, at *2.

In this case, the VE was aware of Velasquez's overhead reaching limitation.  In fact, the ALJ specifically incorporated such restriction in her hypothetical question.  The ALJ stated:

ALJ:   And this person can lift and carry 20 pounds on an occasional basis, 10 pounds on a frequent basis, she can stand and/or walk with normal breaks for a total of about 6 hours in an 8 hour work day.  Sit for a total of about 6 hours in an 8 hour work day, she can push, and/or pull with her upper and lower extremities in a manner, in an unlimited manner as long as it's consistent with the strength limitations just stated.  And I'm going to change that actually, with her right upper extremities.  She should push and/or pull on no more

> than an occasional basis.  She should never climb rope, ladders and scaffolds.  She can
>
> occasionally balance, stoop, kneel, crouch, and crawl.  She has no manipulative limitations
>
> other than that she is limited to reaching overhead, on no more than an occasional basis,
>
> did I say with her right upper dominant extremity?

Tr. 518-519.  In response to the ALJ's hypothetical question, the VE testified that with

Velasquez's reaching restrictions, Velasquez could perform one-third of the office helper and one-

third of the parking lot attendant jobs the VE listed.  Tr. 520-521.  Based on the fact of this case,

the VE's testimony "does not conflict with the DOT and SCO so much as it clarifies how their

broad categorizations apply to this specific case."  *Id.*

Since the office helper and parking lot attendant jobs remain, Velasquez argument that

there are not a significant number of available jobs fails .

Finally, Velasquez contends the ALJ failed to explain why she rejected her hypothetical

question incorporating her "vision and syncopal episode impairments."  Pl.'s Mem. in Support of

Mot. to Reverse at 13.  However, hypothetical questions need not take into account all of

claimant's alleged impairments.  Questions to VE are proper when they take into account the

impairments substantiated by the medical reports and the impairments accepted as true by the ALJ.

*See Gay v. Sullivan,* 986 F.2d 1336, 1340041 (10th Cir. 1993); *Talley v. Sullivan*, 908 F.2d 585,

588 (10th Cir. 1990).  The Court has already discussed Velasquez's allegations regarding visual

problems and found the record did not support these allegations during the time in question.

Additionally, the ALJ specifically addressed Velasquez's allegations of episodes of

syncope, stating:

> With regard to the claimant's episodes of somnolence or syncope, she admits that these have
> occurred since she was a young woman, and gives no indication that they have increased in

38

frequency (Ex. 11/F29, 33, and 38).  Her statements regarding their frequency are somewhat inconsistent, but she told the neurologist who performed her sleep study in July 2003 that she had experienced one approximately 4 months ago, another 3 months ago, and perhaps before that 10 years ago (Ex. 11F/29).  <u>These extremely rare events did not prevent the claimant from performing substantial gainful activity in the past.</u>  Furthermore, she continues to drive, despite her non-compliance with the CPAP machine and despite physicians' orders not to do so (Ex. 5F/14 and Ex. 11F/38).  She also reported on September 25, 2003, that she watched her daughter's children during the day (Ex. 11F/20).  On July 6, 2005, she told a doctor that she was taking care of her grandchildren for the summer, currently had four with her, and was planning on going to the pool today (Ex. 13F/2).  It certainly appears reasonable to restrict the claimant from performing work that involves exposure to unprotected heights and hazardous moving machinery, even though she continues to drive a car.

Tr. 317.  Significantly, on September 30, 2002, Velasquez also reported she "had not had any 'sleep or syncopal' episodes for several months."  Tr. 163.  Moreover, the ALJ's RFC accommodated Velasquez's infrequently occurring  "syncopal episodes" when the ALJ included "should avoid . . . unprotected heights and hazardous moving machinery" in her RFC.  Tr. 313.

At the administrative hearing Velasquez's counsel posed the following hypothetical:

ATT:  Let's take hypothetical number 1 and add to that occasional syncopal episodes, lasting a

minute or less and that's defined, the syncopal episodes, loss of consciousness and posture,

any affect on those 3 jobs?

Tr. 523.  The record does not support counsel's description of Velasquez's "syncopal episodes." Because the medical reports do not substantiate this hypothetical question, the ALJ did not have to accept the VE's response to the hypothetical question.

**E.  Conclusion**

It is not this Court's role on appeal from this agency determination to reweigh the evidence or to substitute its judgment for that of the Commissioner.  *See Hargis v. Sullivan*, 945 F.2d 1482, 1486 (10th Cir. 1994).  The Court's role is to review the record to ensure that the ALJ's decision is supported by substantial evidence and that the law has been properly applied.  After such

review, the Court is satisfied that substantial evidence supports the ALJ's finding of nondisability.

Accordingly, the ALJ's decision is affirmed.

      A judgment in accordance with this Memorandum Opinion will be entered.

 

**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**